UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

|  |  |
|---|---|
| JULIE IRVINE, guardian ad litem of Aubrey Archambeau and Joseph Baker, as named plaintiffs on behalf of a class; AUBREY ARCHAMBEAU, on behalf of a class; and JOSEPH BAKER, on behalf of a class, | 4:21-CV-04224-KES |
|  | MEMORANDUM OPINION AND ORDER |
| Plaintiffs, |  |
| vs. |  |
| JEREMY JOHNSON, Administrator, South Dakota Human Services Center, sued in his official capacity; MATT ALTHOFF, Secretary of the South Dakota Department of Social Services, |  |
| Defendants. |  |

Plaintiffs, Julie Irvine, Juan Alvarez,[1] Aubrey Archambeau,[2] and Joseph

Baker, brought a putative class action lawsuit pursuant to 42 U.S.C. § 1983 for

preliminary and permanent injunctive and declaratory relief, primarily arguing

that defendants have violated their due process rights by holding them in

pretrial detention for extended lengths of time before attempts to restore them

---

[1] The court granted defendants' motion for summary judgment solely against plaintiff Juan Alvarez. Docket 60 at 54. As such, plaintiff Juan Alvarez was terminated from the case. *Id.*

[2] The parties stipulated that Aubrey Archambeau began competency restoration treatment within four months after a state court ordered such competency restoration. Docket 74 at 2. As such, the court holds that defendants did not violate Archambeau's due process rights.

to competency were commenced. *See* Dockets 1, 27. In a previous order, the court determined that if a defendant has had to wait more than four months before competency restoration efforts begin, the State must provide specific reasons for why the prolonged detention is justified. Docket 60 at 39. A bench trial was held on February 18, 2025, on the sole issue of whether defendants could provide specific reasons for why it took the State longer than four months to begin restoration efforts for plaintiff Joseph Baker. *See* Docket 86. Both parties filed posttrial briefs. Dockets 93, 94. Based on the evidence and testimony submitted and the arguments of both parties, the court issues the following order.

**BACKGROUND[3]**

On June 1, 2021, Joseph Baker was arrested and charged with various violations of South Dakota state law. Docket 5-2 at 12-14. Following a competency hearing, on September 8, 2021, a state court found Baker incompetent and ordered Baker to be committed and transported to "a residential state mental health facility or facility authorized by statute to provide restoration services." Docket 89 at 18-20. Baker was referred to the South Dakota Human Services Center (HSC) for competency restoration

---

[3] The court summarized plaintiffs' claims, the procedural history of this case, and South Dakota's statutory competency scheme in its prior order denying plaintiffs' motion for class certification and will not repeat that background here except as necessary to give context to the parties' current arguments. *See* Docket 60 at 2-8.

treatment.[4] *Id.* at 21. Baker was admitted to HSC for treatment over five-and-a-half months later on February 24, 2022. *Id.* at 1.

On December 20, 2021, while Baker was in custody at the Minnehaha County Jail and awaiting transfer to HSC, *id.* at 18-22, plaintiffs filed a class action lawsuit against defendants "on behalf of mentally ill people who are [currently or in the future will be] accused of crimes in South Dakota, have been found incompetent, and are incarcerated for longer than allowed by the due process clause[,]" Docket 1 at 2-3; *see also* Docket 27 at 2-3. Plaintiffs moved to certify the class, Docket 36, which the court denied under Federal Rule of Civil Procedure 23(a), Docket 60 at 53. Plaintiffs moved the court to reconsider its denial of the class, Docket 61, which the court also denied, Docket 70 at 13.

In its initial order denying class certification, the court adopted the following framework to analyze plaintiffs' due process claims:

> [An individual] waiting four months or less for restoration efforts—while often less than ideal and regrettable—does not offend due process. But once an individual has had to wait more than four months, the court finds that the burden shifts to the State to submit specific reasons for why the prolonged detention, without services, is justified. Specifically, the State must proffer reasons specific to the individual for why it must take longer to perform restoration efforts.

---

[4] HSC has several other programs in addition to its competency restoration program. Docket 81-1 at 3. These include: an adult acute psychiatric program, an adult psychiatric rehabilitation program, an adolescent psychiatric program, an inpatient substance use disorder treatment unit, a nursing home program, and an intensive treatment unit. *Id.*

Docket 60 at 39. In accordance with the adopted framework, the court concluded that because Baker had been held for five and a half months before he was admitted to HSC for competency restoration treatment, Baker had "established a presumptive violation of [his] Due Process Clause rights." *Id.* at 47. Because the record was insufficiently developed, however, the court held a bench trial on February 18, 2025, to determine if the State could provide reasons specific to Baker that justified his prolonged detention. Docket 86.

At trial, plaintiffs called Dr. Stephen P. Manlove[5] to offer his opinion on whether there were reasons specific as to Baker that would justify his prolonged detention. *See id.* at 1; Docket 90 at 1. After his review of Baker's medical and jail records, Dr. Manlove concluded that the State did not have a reason specific to Baker to justify his five-and-a-half-month wait before beginning competency restoration treatment. *See also* Docket 90 at 1-2. Specifically, Dr. Manlove testified that there was no indication that Baker was a flight risk, posed a significant danger to the community, or required additional resources unavailable at HSC. *See also id.* Dr. Manlove also testified that before being admitted to HSC, Baker only needed to undergo an evaluation, which could be completed in a couple of hours. Dr. Manlove testified that any aggressive behavior Baker exhibited could be treated in an inpatient

---

[5] Dr. Manlove is a board-certified psychiatrist with a subspecialty certification in forensic psychiatry. Docket 90 at 3-4. He has practiced psychiatry since 1987 and reported evaluating around 16,000 patients in the 27 years he practiced inpatient psychiatry. *Id.* at 1. Dr. Manlove also indicated that he has completed around 1,000 forensic evaluations, which includes competency evaluations for those in jail. *See id.* Currently, Dr. Manlove works at and supervises an outpatient clinic in Rapid City, South Dakota. *Id.*

psychiatric setting—like HSC—and the only fight he engaged in with another inmate took place after he received treatment at HSC. *See also id.* at 2. Dr. Manlove indicated that once Baker began receiving medication to treat his schizophrenia at HSC, his condition improved.

To explain why Baker's prolonged detention was justified, defendants called HSC's Deputy Director, Jessie Foote. Docket 86 at 1. Employed by HSC since 2002, Foote testified that during the time that Baker was waiting to receive competency restoration treatment at HSC, she worked as HSC's Director of Admissions. In that role, Foote was tasked with overseeing all admissions to HSC, including competency restoration admissions.

Foote testified that in 2021, HSC had fifteen beds dedicated to competency restoration patients located throughout HSC's buildings.[6] *See also* Docket 90 at 18. During this same period, Foote indicated that HSC continued to experience an increase in the number of competency referrals. Foote also testified that due to capacity and staffing issues, HSC had to decrease the number of individuals it could admit for services. Due to these constraints, Foote indicated that individuals referred for competency restoration at HSC were added to the waitlist before they could be admitted to HSC.

Foote also explained HSC's procedure that was in place in 2021 for how detainees were admitted to HSC's competency restoration program. Foote testified that after a state court issued an order for competency restoration,

---

[6] In January of 2023, HSC consolidated the fifteen beds set aside for competency restoration into a single treatment unit at HSC. Docket 88 at 3.

HSC would be notified. Foote testified that typically the detainee's attorney would send HSC a competency referral, which included the court order finding the detainee incompetent and an outside competency evaluation. HSC would then gather additional records based upon the outside evaluation. Foote explained that it could take anywhere from an hour to a week to obtain these records. After obtaining the records, Foote would then work with her clinical team to determine where detainees would receive treatment.[7]

Once HSC reviewed the records, Foote would reach out to the defense attorney and the state attorney and recommend where the specific detainee should be treated. Foote indicated that if someone was refusing medication or showed signs of psychosis, this individual was typically recommended for treatment at HSC. Foote explained, however, that because not all detainees require acute psychiatric care to have their competency restored, some detainees could be served by jail-based or other outpatient programs. *See also* Docket 90 at 18. Foote further explained that a detainee would typically be suitable for jail-based competency restoration treatment if the defendant's symptoms were in remission or if the detainee had a history of taking prescribed medications.

---

[7] As of June 1, 2021, a criminal defendant in South Dakota could receive competency restoration treatment at HSC, at Avera Behavioral Health, through jail-based programs in Minnehaha or Pennington County, or at an outpatient program through Community Mental Health Center. Docket 90 at 17. In 2024, the jail-based competency restoration programs were expanded to include Davison, Beadle, and Roberts County. Docket 88 at 5. Additionally, there were 13 community mental health centers located across the state. *Id.*

If an individual was recommended for treatment at HSC, the individual would be placed on HSC's waitlist. Once the individual was at the top of the waitlist and eligible for admission, HSC would reach out to the defense attorney to schedule the detainee's transport from jail to HSC. Foote further testified that once an individual had their competency restored at HSC, an HSC evaluator would issue a certificate of recovery and file it with the state court. HSC would provide notice to both the defense attorney and the state attorney of the certificate and make a request to have the restored defendant transported back to jail. Foote indicated that HSC had to wait for a court order discharging a detainee before the detainee could be transferred back to jail.

In Baker's case, Foote testified that she received Baker's referral for competency treatment on September 17, 2021. *See also* Docket 89 at 21. After Foote (and her clinical team) determined that Baker was not taking his prescribed medications and was experiencing psychotic episodes while at the Minnehaha County Jail, *see also id.*, it was recommended that Baker be admitted to HSC for competency restoration treatment. As such, when Baker was added to HSC's waitlist in October of 2021, he was 19th on the list. Docket 91 at 1. Baker progressed to 13th in November; 7th in December; 6th in January; and 4th in February. *Id.* at 2-5. On cross-examination, Foote confirmed that Baker's admission to HSC was not delayed because he refused treatment, was a flight risk, was a danger to the community, or required additional resources that HSC could not provide. Instead, Foote testified that if an individual identical to Baker was listed as 19th on the waitlist during the

7

same period, he would have progressed on HSC's waitlist in the same manner as Baker with an admission date of February 24, 2022.

Foote testified that it took over five months to admit Baker to HSC because several other individuals required treatment, and HSC faced an ongoing issue with detainees staying at HSC long past the date when their competency had been restored. Foote explained that these issues prevented HSC from quickly turning over beds so that HSC could admit new patients. Specifically in Baker's case, Foote explained that Baker's admittance was delayed because three detainees were not promptly discharged from HSC.[8] Foote testified that if the three detainees had been discharged within a week from when their certificates of recovery were filed, Baker would have been admitted by December 9, 2021. *See also* Docket 89 at 1.

Foote concluded that a week was a reasonable time for calculating when a detainee should have been discharged based upon HSC's recent timeline of discharging detainees whose competency had been restored. Foote testified that after the South Dakota Legislature amended SDCL § 23A-10A-4.1,[9] which

---

[8] Two of the detainees waited two-and-a-half weeks and one waited nearly two months before being discharged from HSC. Docket 89 at 1.

[9] The parties have stipulated that the court may take judicial notice of the 2023 amendment to SDCL § 23A-10A-4.1. Docket 74 at 3. SDCL § 23A-10A-4.1 now provides:

> If the director of the facility under which the defendant is being treated in accordance with § 23A-10A-4 determines that the defendant has recovered to an extent that the defendant is able to understand the nature and consequences of the proceedings against the defendant and to assist properly in the defense, the director shall promptly file a certificate to that effect with the clerk of the court

describes the manner HSC should follow to discharge detainees, HSC has been able to decrease the delay between when a certificate of recovery is filed and when a detainee is discharged from HSC. Prior to the amendment, Foote testified that after a certificate of recovery was filed, HSC had to wait for the state court to issue an order requiring the detainee's transfer back to jail. Foote explained that because detainees typically had more privileges at HSC than they did in jail, their defense attorney had little incentive to seek quick court action transferring their client back to jail. Foote testified that after the amendment was passed, once a detainee's certificate of recovery is filed, the detainee is discharged as soon as reasonably possible.[10] Based upon HSC's recent experience, detainees have been discharged within one week and patients have been admitted faster. Thus, Foote concluded that if the statute had been amended during the time when Baker was on HSC's waitlist, he would have been admitted within four months of the court order finding him incompetent. *See also* Docket 89 at 1.

---

that ordered the placement or commitment, and the defendant shall be discharged from the facility where the defendant is hospitalized, if applicable.

SDCL § 23A-10A-4.1.

[10] Foote noted the amendment change in a proposed court order, which included the language that "the defendant shall be discharged from the facility where the defendant is hospitalized and returned to the custody of COUNTY Jail." Docket 88 at 2. In court orders used before the amendment, the language reflected that the "[d]efendant shall remain at the facility until he can be brought before th[e] [c]ourt for further proceedings." Docket 89 at 19.

Following Foote's testimony, plaintiffs called Jeremy Johnson as a rebuttal witness. Docket 86 at 2. Johnson, as the Head Administrator for HSC, testified that he is responsible for several programs at HSC, including the competency restoration program. *See also* Docket 81-1 at 2-3. Johnson testified that because of increases in competency referrals in 2021-2022, HSC had, at times, increased bed capacity to 16 to 17 beds. Johnson also agreed with Foote's earlier testimony that if HSC had increased the number of beds available by one or two beds, Baker would have been admitted to HSC by January 4, 2022.

Further, Johnson testified that on January 1, 2022, and February 1, 2022, HSC was utilizing all 15 beds set aside for competency restoration. Upon being presented with a chart that indicated only 14 detainees were receiving competency restoration treatment on January 1, 2022, and only 11 detainees were receiving treatment on February 1, 2022, *see* Docket 90 at 23, Johnson explained that the discrepancy was due to individuals whose competency had been restored and were awaiting discharge. In his deposition testimony, provided on January 11, 2023, Johnson gave a slightly different explanation for this discrepancy. In his deposition, Johnson explained that, at times, the number of people receiving competency restoration treatment may dip below 15 when HSC's capacity for its civil commitment or other programs increased. Docket 81-1 at 8. Johnson also testified at his deposition that HSC has maintained a waitlist for competency restoration treatment since 2015. *Id.* at 7-8.

## DISCUSSION

At trial, and in their posttrial brief, defendants offer two reasons as sufficient justification for why Baker's admission to HSC took longer than four months: (1) Baker was ineligible for jail-based competency restoration treatment; and (2) state courts created a chain of delays that prolonged Baker's detention. *See* Docket 93 at 3-5. The court first provides a general outline of the relevant framework to analyze plaintiffs' substantive due process claims, and then addresses each of defendants' proffered reasons.

### A. Framework to Analyze Plaintiffs' Due Process Claims[11]

For defendants who are detained pending competency restoration treatment, the Due Process Clause "requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *see also United States v. Donnelly*, 41 F.4th 1102, 1106 (9th Cir. 2022) (holding that a pre-competency restoration detention is subject to *Jackson*'s "reasonable relation" requirement). As this court previously determined, where a defendant waits "four months or less for restoration efforts" the defendant's due process rights are not violated because "the State . . . must have a reasonable amount of time to perform its duties" in processing and transporting the defendant to a suitable facility for treatment. Docket 60 at 39-40. But "[o]nce the four months

---

[11] The court provided a full outline and analysis for the framework the court adopted regarding plaintiffs' due process claims in its initial order denying plaintiffs' motion for class certification. *See* Docket 60 at 32-48. As such, the court summarizes the legal standard from its previous order as relevant here to decide the issue before the court.

have passed . . . [t]he State must proffer reasons specific to the individual in order for the court to determine whether the individual's prolonged detention is still reasonable in scope and duration to the purpose for which the individual is detained—to obtain competency restoration procedures." *Id.* at 41.

To determine whether sufficient reasons exist, the court should consider the totality of the defendant's circumstances. *See, e.g.*, *United States v. Magassouba*, 544 F.3d 387, 415-16 (2d Cir. 2008) (reasoning that the defendant's total circumstances should be considered when determining whether his detention is violative of due process). Such circumstances may include whether a defendant is a flight risk or a danger to the community, *see, e.g., United States v. Lee*, 2022 WL 18275882, at *5 ("One important consideration for courts determining whether a defendant's rights are violated is whether the defendant is already being detained for some other reason other than their incompetency."), or whether the defendant refuses treatment, *see Magassouba*, 544 F.3d at 418-19 (finding no due process violation where delay was "largely attributable to [the defendant's] own action" in refusing treatment). A state's resource constraints, however, are insufficient to justify a prolonged delay under the Due Process Clause. *See* Docket 60 at 47-48 (collecting cases).

## B. Whether Baker's Ineligibility for Jail-Based Treatment is a Reason Specific to Him That Justifies His Prolonged Detention

Defendants first argue that the delay was justified because Baker "was not a candidate" for jail-based competency restoration treatment. Docket 93 at 5-6. Defendants suggest that if jail-based treatment was appropriate for Baker, he would have bypassed HSC's waitlist entirely and started treatment within

12

four months. *Id.* at 5. Plaintiffs acknowledge that Baker would have started treatment earlier if eligible for jail-based treatment but argue that this reason is insufficient to justify Baker's prolonged detention because Baker's need for treatment at HSC is not specific to him. *See* Docket 94 at 6 (arguing that Baker is the same as any other detainee who requires treatment at HSC). As such, plaintiffs argue that if Baker's need for treatment at HSC is a reason specific to him, it would exempt the State from the requirement that defendants need to begin competency restoration treatment within four months. *Id.*

In South Dakota, detainees who require a higher level of care must go to HSC for competency restoration treatment.[12] *See* Docket 88 at 6 ("HSC's determined capacity for inpatient competency restoration services [is] reserved for those experiencing acute psychiatric issues that prevent them from being served in a lower level of care."). Treatment options outside of HSC are for those detainees who do not require acute psychiatric care to be restored to competency. Docket 90 at 17. While the location where a detainee requires treatment may be a factor outside the State's control, the State does have control over the capacity limits set at HSC—a factor that all detainees who require treatment at HSC must confront.

---

[12] Defendants can also receive a higher level of inpatient psychiatric care at Avera Behavioral Health. Docket 90 at 17. Because this is an outpatient form of care, however, a state court must "have made a determination that [a defendant is] not considered to be a danger to the health and safety of others and ha[s] been bonded out of custody." Docket 88 at 5. As such, defendants who require a higher level of care and who are in custody must receive competency restoration treatment at HSC. Docket 90 at 17.

The South Dakota Department of Social Services (DSS) is legally required to "establish, at a minimum, appropriate acute, intermediate, and long-term psychiatric units at [HSC]," SDCL § 27A-4-8, and in conjunction with the head of HSC, must "establish capacity limits for the treatment areas" at HSC, SDCL § 27A-4-20. DSS and HSC cannot exceed these capacity limits unless they declare "an emergency situation." *Id.* "If capacity limits are reached, [DSS and HSC] shall contract for appropriate services for those qualified for admission." *Id.* As Johnson testified, DSS and HSC have never declared "an emergency situation." Docket 81-1 at 17. And while HSC has contracted with Avera Behavioral Health to provide inpatient psychiatric competency restoration services, Docket 90 at 17, this contract has no effect on detainees like Baker who are in custody and require treatment at HSC, *see* Docket 94 at 12-13. Instead, all detainees who require treatment at HSC are put on the same waitlist due to the lack of bed availability and resource constraints at HSC. *See* Docket 81-1 at 3 (noting that HSC's operating capacity has been "trending down" since 2019 due to loss of staff).

Because HSC is the only option for detainees who require an acute psychiatric level of competency restoration treatment, and the State has chosen not to expand opportunities for individuals to receive such care elsewhere, detainees who require competency restoration at HSC should not be penalized for the State's resource allocation decisions. *See, e.g.*, *United States v. Calderon-Chavez*, 688 F. Supp. 3d 472, 482 (W.D. Tex. 2023) (holding that "the executive and legislative branches' failure to allocate sufficient resources to

14

promptly admit incompetent criminal defendants to psychiatric facilities" did not excuse a defendant's nine-month pre-hospitalization delay); *United States v. Wazny*, 2022 WL 17363048, at *6 (M.D. Penn. Dec. 1, 2022) (arguing that the lack of administrative and facility resources is of "limited significance when balanced against the due process and statutory rights of a criminal defendant"). Thus, based on the competency restoration treatment system created by the State, a detainee in Baker's circumstances would also only be able to receive treatment at HSC and would have faced the same wait time as Baker. As such, the mere fact that Baker was unsuitable for jail-based treatment cannot be used as a reason specific to him to justify his prolonged detention.

Further, Baker's circumstances are distinguishable from cases where detainees could receive treatment at other locations, such as through a jail-based treatment program, but have successfully petitioned to receive treatment at HSC. *See* Docket 90 at 18 ("HSC has experienced situations where a defendant is appropriate for services in one of the non-HSC settings but has successfully argued for specific treatment at HSC. This often delays the [detainee's] treatment until a bed at HSC is available."). Where a detainee has petitioned to receive treatment at HSC, the detainee has placed themselves at the mercy of HSC's waitlist on when they may begin receiving treatment. *See id.* In such a scenario, this could be a reason specific to that detainee justifying their prolonged detention. In comparison, Baker, who was left with no option but to receive treatment at HSC, had no control over his long detention period.

15

As indicated above, defendants' suggestion that Baker's unsuitability for jail-based treatment constitutes a sufficient reason justifying his prolonged detention sidesteps the real reason for why he had to wait to receive treatment, namely, that HSC has resource constraints that exceed demand. Because the State's limited resources are insufficient to justify a prolonged delay, the court rejects defendants' argument that Baker's unsuitability to jail-based treatment can be used as a reason specific to him to justify his prolonged detention.

### C. Whether the Chain of Delays Created by State Courts is a Reason Specific to Baker That Justifies His Prolonged Detention

Defendants next argue that "the delay in Baker's admission to [HSC], where he received treatment for competency restoration, owed to a failure by state trial courts to timely issue orders necessary to discharge from HSC detainees who were certified as successfully restored to competency." Docket 93 at 1. Defendants allege that the delay caused by the state trial courts "created a chain reaction of delayed admissions that prevented the prompt admission of Baker to HSC" and that without these delays, Baker would have been timely admitted. *Id.* at 1-2.

Defendants argue that the past version of SDCL § 23A-10A-4.1 was the "driving force" behind the chain of delays prolonging Baker's detention. *Id.* at 3-4. For detainees at HSC, the prior version of SDCL § 23A-10A-4.1 required HSC to "promptly file" a detainee's certificate of recovery once their competency had been restored. SDCL § 23A-10A-4.1 (2020). After the state court notified counsel, the court was required to hold a hearing to determine if the detainee's competency was restored. *Id.* If restored, the statute provided that "the court

16

shall order [the detainee's] immediate discharge from the facility where the [detainee] is hospitalized." *Id.* Defendants argue that because it often took courts a long period of time to hold this hearing and order a detainee's discharge, HSC was unable to quickly transfer detainees whose competency had been restored back to jail and admit new patients. Docket 93 at 3-4. As such, defendants conclude that this is a specific reason "over and above the bare fact of HSC's financial and staffing constraints." *Id.* at 7.

Applying this reasoning to Baker's case, defendants point to three specific detainees whose delayed transfer from HSC back to jail resulted in the delay preventing Baker from being admitted within four months. *See id.* at 4. Defendants note that of the three, two detainees were held roughly two-and-a-half weeks, and one detainee was held nearly two months after their certificates of recovery were filed. *Id.*; *see also* Docket 89 at 1. Foote explained that if the three detainees were discharged within a week from when their certificates of recovery were filed, Baker would have been admitted to HSC by December 9, 2021—well within four months from the court order finding him incompetent. Docket 93 at 4-5; *see also* Docket 89 at 1. Defendants argue that this chain of delays is specific to Baker because "they are not abstract problems that equally impacted all of those awaiting treatment at any point in time." Docket 93 at 6. Instead, the "chain of delays involving the discharges of three specific detainees" created the chain of delays resulting in Baker's delayed admission. *Id.* Defendants further argue that with the amendment to SDCL § 23A-10A-4.1,

effective July 2023, the delays created by state court action were "largely eliminated." *Id.*

In response, plaintiffs argue that this chain of delays cannot serve as a reason specific to Baker because a similarly situated detainee would progress up the waiting list in the same manner as Baker. Docket 94 at 3-4, 8 (asserting the "delays were normal parts of the system, so nothing about these delays were specific to Baker"). Further, plaintiffs argue that based on Dr. Manlove's testimony, defendants cannot provide a reason specific to Baker to justify his prolonged detention. *Id.* at 4-5. As Dr. Manlove explained, Baker's records do not indicate that he was a flight risk, a danger to the community, declined competency restoration treatment, or required additional resources that HSC could not provide. *See also* Docket 90 at 1-2.

Here, defendants argue that the state court delays were not "ordinary" parts of the justice system. Docket 93 at 7-8. Instead, such delays were created by "poor structural incentives" that have been "effectively addressed by [the amendment]." *Id.* at 8. If defendants are correct that HSC was experiencing delays in admitting new detainees because "poor structural incentives" created state court delays, one would expect to see that following July 2023—after the South Dakota Legislature passed the amendment to SDCL § 23A-10A-4.1— detainees on HSC's waitlists were generally admitted within four months.[13]

---

[13] Based upon Foote's testimony, if the amendment had existed during the time Baker was on HSC's waitlist, Baker would have been admitted to HSC by December 9, 2021. *See* Docket 89 at 1. This is less than four months after Baker was deemed incompetent by a state court on September 8, 2021, *see id.*

Data submitted by defendants detailing HSC's waitlists following July 2023 calls this conclusion into question, however.

As plaintiffs note, from July 2023 to October 2024, "people waited more than four months for admission [to HSC] in thirteen out of [sixteen] months." Docket 94 at 8; *see also* Docket 89 at 53-68 (providing HSC's waitlists from July 2023 to October 2024). If the range is extended from July 2023 to January 2025, individuals on HSC's waitlist waited more than 4 months in 13 out of 19 months, roughly 68% of the time. *See* Docket 89 at 53-71. In comparison to the 26 months prior to the amendment passing, from January 2021 to June 2023, individuals on HSC's waiting list waited more than 4 months 46% of the time. *See id.* at 26-52 (providing that at least one individual on HSC's waitlist waited more than 4 months in 12 out of the 26 months); *see also* Docket 94 at 25-27 (providing the same). The court acknowledges that the differences in these percentages could be due to numerous factors, including an increase in referrals post-July 2023 at HSC compared to the number of referrals made prior to July 2023.[14] Even so, while defendants argue that the amendment rectified the long delays in HSC's discharges, the court is not convinced that the state court delays are a reason specific to Baker to justify his prolonged detention.

at 18-20, and when HSC first received Baker's records on September 17, 2021, *id.* at 21.

[14] For example, the average number of individuals on the waitlist post-July 2023 is higher than the average number of individuals on the waitlist pre-July 2023. *See* Docket 89 at 26-71 (averaging about 13 waitlisted individuals pre-July 2023 and 15 waitlisted individuals post-July 2023).

Instead, the court finds that the prolonged delay in Baker's admission to HSC is attributable to systemic resource constraints, not a specific chain of delays caused by state courts. For instance, the three specific detainees to which defendants cite were not the only potential causes for delay in Baker's admittance to HSC. HSC has admitted individuals lower on the waitlist before admitting those higher on the waitlist. *Compare* Docket 89 at 1 (providing that M.M. was admitted on an earlier date than E.P. or C.H.E.), *with* Docket 91 at 1 (providing that in October of 2021, E.P. was fourth and C.H.E. was sixth on HSC's waitlist while M.M. was seventh on the waitlist). Such was the case when Baker was on HSC's waitlist. *Compare* Docket 89 at 1 (providing that D.C. was admitted before Baker on November 11, 2021), *with* Docket 91 at 1 (providing that D.C. was not on HSC's waitlist in October of 2021 while Baker was 19th on the waitlist). Because another individual was admitted to HSC for competency restoration treatment before Baker, despite not being on HSC's waitlist, *see id.*, this caused a delay in when Baker could have been admitted to HSC. This is particularly problematic because both Foote and Johnson confirmed that if one or two more beds were available, Baker could have been admitted within four months by January 8, 2022. *See also* Docket 94 at 9. Thus, it is more reasonable for this court to conclude that Baker's prolonged delay was due to the lack of available beds at HSC—a continual problem for detainees who must receive treatment at HSC.

Further, other problems exist with how HSC runs its waitlist and admits new patients to its available beds. Plaintiffs argue that "only in the final three

20

months before the trial of this case [did] the State reduce[] the waiting list [at HSC] so that it was consistently less than four months long." Docket 94 at 8; *see also* Docket 89 at 69-71 (detailing HSC's waitlists from November 2024 to January 2025). Plaintiffs assert that this is nothing more than defendants' attempt to "spruce [HSC's waitlist] up for trial." Docket 94 at 16. The data from HSC's waitlist conforms with how HSC has operated in the past. As Johnson admitted during his deposition, HSC often expedites its admissions process in response to lawsuits claiming that those awaiting competency restoration are being held in jail for prolonged periods of time. *See* Docket 81-1 at 18 (testifying that HSC will expedite an individual's admission where the individual claims they have been held for an unduly long period before receiving treatment because "[HSC has] found that contesting [the lawsuits] has not been successful historically"). If HSC can expedite the admission of certain detainees at the expense of others, the detainee who is bypassed on the waiting list is detained for a longer period that is not reasonably related "to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738.

It is also unclear whether HSC utilizes these 15 beds solely for the purposes of competency restoration. As plaintiffs note, it does not appear that HSC was utilizing all 15 beds during the time Baker was waiting to be admitted. Docket 94 at 9. Data submitted by defendants provided that 14 individuals were receiving competency restoration treatment on January 1, 2022, and 11 individuals were receiving competency restoration treatment on February 1, 2022. Docket 90 at 23. Johnson provided conflicting testimony on

the reason for this discrepancy. At trial, Johnson testified that the discrepancy reflected fluctuations between HSC discharging detainees whose competency had been restored and admitting new detainees. In his deposition, however, Johnson explained that the increased capacity demands for other programs run at HSC, such as its civil commitment program, may mean that HSC does not use all 15 beds for competency restoration. *See* Docket 18-1 at 8. This last reason for the discrepancy is problematic as some of the programs that HSC runs do not have the same due process concerns that surround competency restoration. *See* Docket 81-1 at 17 (explaining that HSC has some special units, including its substance use disorder treatment unit, where individuals can voluntarily receive treatment). If HSC was not utilizing all 15 beds at the time Baker was on the waitlist, thus prolonging his period of detention, this also calls into question defendants' argument that state court delays were the cause of Baker's prolonged detention.

As such, even if the amendment to SDCL § 23A-10A-4.1 was in place while Baker was on the waitlist, thus potentially allowing HSC to discharge the three detainees who had delayed discharges within a week's time, it would be disingenuous to find that the state court delays are a reason specific to Baker that justified his prolonged detention. Instead, at its core, this is a state resource problem.

As both Foote and Johnson testified, since 2019, HSC has experienced significant wait times for bed spaces due to limited staffing, resources, and bed availability and an increase in competency restoration referrals. *See also*

22

Docket 81-1 at 3 (noting that starting in 2019, HSC's operating capacity has been "trending down" despite the increased demands for services). Despite defendants' argument that state courts were to blame for the delays during the time Baker was waiting for services, based upon the data submitted by defendants, delays in admitting new patients to HSC continue to remain an issue. *See* Docket 89 at 53-71. And as Foote and Johnson testified during the trial, if HSC had increased the number of beds by one or two, Baker would have been admitted to HSC by January 4, 2022. *See also* Docket 94 at 9. Admitting Baker within four months by adding one or two more beds is more indicative of a resource allocation problem rather than an on-going issue with state court created delays. As such, when balanced against the due process rights of a criminal defendant, the resource-constraints placed upon HSC cannot justify a detainee's lengthy pre-treatment detention. *See Wazny*, 2022 WL 17363048, at *6; *see also United States v. Mouton*, 2023 WL 3872206, at *2 (S.D. Tex. June 7, 2023) ("[To find that logistical hurdles excuse a due process violation would render the Due Process Clause meaningless.").

The court also rejects defendants' argument that plaintiffs' definition of "specific to the individual" creates "a litany of absurd results." *See* Docket 93 at 6. Defendants argue that based on plaintiffs' definition, if "HSC's facility was severely damaged by a fire or natural disaster[,]" this catastrophe would not excuse any additional delay beyond four months because it is not specific to any one detainee. *Id.* at 7. Defendants argue that accepting this definition would "preclude HSC from being afforded additional time in the case of an

23

unexpected outbreak of infectious disease at the HSC facility, an unlawful labor strike, or many other imaginable circumstances over which HSC has no control." *Id.* The court disagrees with defendants' analysis because while these events do "not turn on subjective characteristics of any individual detainee[,]" *see id.* at 7, the events defendants cite and Baker's circumstances are distinguishable.

For example, this is not an instance where an unexpected event occurred at HSC to suddenly create a backlog of individuals waiting to be admitted. *See, e.g.*, *United States v. Delorme*, 2023 WL 8020262, at *23 (D.N.M. Nov. 17, 2023) (finding no due process violation under *Jackson* where delays to competency restoration treatment were due to backlogs caused by COVID-19 and at-capacity facilities). Instead, HSC has experienced an increase in referrals for competency restoration every year since 2019. Docket 81-1 at 8. Johnson also testified that he believed that referrals would continue to increase. *See id.* And prior to the amendment to SDCL § 23A-10A-4.1 becoming effective in July 2023, the alleged delays created by state courts were not an unexpected event leading up to or at the time Baker was on HSC's waitlist. *See* Docket 89 at 26-39 (detailing that from January 2021 to February 2022, in 9 out of the 14 months, at least one detainee was on HSC's waitlist more than four months); *see also* Docket 94 at 25-26 (plaintiffs' chart providing the same). Yet in response to the increasing demand for competency restoration treatment, HSC has maintained its capacity for competency restoration at 15 beds. *Id.* at 3. While HSC has, at times, increased the bed capacity to 16 or 17 beds in

response to rising demand, *see* Docket 81-1 at 7, the State has not taken the necessary steps to ensure that there is sufficient staff or adequate resources to meet the increasing demands of the judicial system. *See also United States v. Lara*, 671 F. Supp. 3d 1257, 1265 (D.N.M. 2023) ("[I]f the Government wants to continue to file charges against severely mentally ill individuals . . . then the Government needs to figure out how to allocate those resources [to competency restoration facilities].") (internal quotation marks omitted) (alteration in original).

Because the court concludes that the State court delays are not reasonably related to Baker's prolonged detention, and instead finds that Baker's detention was a result of HSC's limited staffing, resources, and bed availability, the court holds that defendants have failed to provide a sufficient reason specific to Baker that justifies his prolonged detention.

### D. Remedy

In their amended complaint, plaintiffs seek "preliminary and permanent declaratory and injunctive relief sufficient to remedy the unconstitutional conditions under which class members are confined, and under which future members of the class will be confined." Docket 27 at 6. Plaintiffs also seek reasonable attorney's fees and costs, and other relief the court deems just. *Id.* When other courts have found a due process violation under similar circumstances, those courts have ordered the detained defendant to be admitted for treatment. *See, e.g.*, *Donnelly*, 41 F.4th at 1107-08 (remanding to district court with instructions to order the Attorney General to hospitalize the

defendant within seven days); *Wazny*, 2022 WL 17363048, at *7 (requiring government to begin competency restoration treatment for the defendant within 30 days of the court's order). Baker, however, has already received competency restoration treatment at HSC. *See* Docket 89 at 1. Further, in their amended complaint, plaintiffs sought relief on behalf of present and future "mentally ill people who are accused of crimes in South Dakota, have been found incompetent, and are incarcerated for longer than allowed by the due process clause awaiting an attempt to restore them to competency." Docket 11 at 2-3. Because this court has denied plaintiffs' motion for class certification, *see* Docket 60 at 53, and denied plaintiffs' motion for reconsideration for class certification, *see* Docket 70, it is unclear what relief plaintiffs now seek. Thus, the court orders additional briefing from the parties to address what remedy the court should now extend.

## CONCLUSION

For the above reasons, the court holds that the State has not provided sufficient reasons specific to Baker justifying his five-and-a-half-month detention prior to receiving competency restoration treatment. As such, the court holds that Baker's detention was not reasonably related to his confinement, *see Jackson*, 406 U.S. at 738, and that his due process rights have been violated. It is

ORDERED that both parties shall file briefs addressing what remedy is appropriate in this case. Briefing from the plaintiffs will be due on or before

26

April 21, 2025. A response from the defendants will be due on or before April

28, 2025.

DATED April 11, 2025.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE